THE UNITED STATES US DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
DIVISION

| | |
|---|---|
| SANDY SEPULVEDA, ) <br> Plaintiff, ) <br> ) <br> Franciscan Alliance Inc., Franciscan ) <br> Physician Network, Specialty Physicians of ) <br> Illinois LLC, Rob Harnage, ) <br> Megan Zimmerman, & Tamara Awald ) <br> Defendants. | Case No.: 2:24-CV-00039 |

**PLAINTIFF'S COMPLAINT**

NOW COMES Plaintiff Sandy Sepulveda (hereinafter "Sandy"), by and through counsel, Robin Remley of the Law Office of Robin Remley LLC and for her COMPLAINT against the Defendants, Franciscan Alliance Inc. ("FRANCISCAN"), Franciscan Provider Network ("FPN"), Specialty Physicians of Illinois ("SPI") Rob Harnage ("Harnage"), Megan Zimmerman ("Zimmerman"), Tamara Awald ("Awald") and unknown supervisors and managers, states as follows:

**I. Introduction**

1. Plaintiff filed this action to redress violations by Defendants, Franciscan, FPN, SPI, Harnage, Zimmerman, Awald, and unknown supervisors and managers of the Family Medical Leave Act ("FMLA"), Age Discrimination in Employment Act ("ADEA"), Religious discrimination under Title VII of the Civil Rights Act ("Title VII"), sexual harassment/hostile work environment under Title VII of the Civil Rights Act ("Title VII"), and retaliation for exercising rights and/or complaining of violations under the foregoing, and violations of the Illinois Whistleblower Protection Act and other related claims.

## II. Jurisdiction and Venue

2. This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions offair play and substantial justice.

3. The United States District Court for the Northern District of Indiana has original subject matter jurisdiction, and venue is properly laid in this district because the claims arise under laws of the United States, and the majority of actions took place in the county of Lake, State of Indiana.

## III.   Parties/Background

4. Plaintiff Sandy Sepulveda is a citizen of the United States, and at all times described herein, was residing in the County of Lake, State of Indiana. Sandy is 58 years old.

5. Defendants, Franciscan and/or FPN and/or SPI, do business in County of Lake, State of Indiana and in the County of Cook, State of Illinois. Sandy primarily worked in Indiana, but also worked in Illinois on behalf of, and in the employ of Franciscan and/or FPN and/or SPI.

6. Defendants Rob Harnage ("Harnage"), Megan Zimmerman ("Zimmerman"), Tamara Awald ("Awald") were all supervisors of Sandy, or human resource professionals, with authority and/or control over employment actions with respect to Sandy, including but not limited to her termination, which is the subject of this litigation. All were employed by Franciscan, FPN or SPI.

7. Harnage was a supervisor or a superior of Sandy—with frequent contact and authority over employment decisions regarding Sandy, up to her own termination date.

8. Zimmerman was Sandy's direct supervisor, and had authority over employment decisions pertaining to Sandy up to and including her termination.

9. Awald had authority over employment decisions pertaining to Sandy up to and including her termination.

10. All of the foregoing individuals had authority and control to prevent or control or perpetuate actions with respect to Sandy's employment. All took part in human resource related activities and actions, and either had knowledge of requirements of the FMLA and other employment laws at issue, or at least should have known of such requirements and responsibilities had they proper inquired and reviewed and trained, as they were clothed with the responsibility to do so.

**Factual Background**

11. At all relevant times, Sandy worked as Risk Manager for Franciscan and/or FPN and/or SPI, on a full-time basis, up and until her termination on or about August 24, 2023.

12. Dating back to 2021, Sandy discovered that her boss, Rob Harnage, was having a romantic relationship/affair with another employee, Nicole Pugh.

13. From approximately November 2021 up until September of 2022, there was much interoffice discussion about the relationship between Pugh and Harnage, and how it affected various employees, the office dynamics, morale, and conditions of employment.

14. Many employees felt that Harnage's relationship with Pugh also showed favoritism to Pugh based on their presumably sexual relationship.

15. Employees, including Sandy, felt uncomfortable working in a Catholic/religious organization where such behavior was tolerated, because of their religious beliefs and because it was seemingly a violation of the Ethical and Religious Directives for Catholic Healthcare Services, by which Franciscan and its employees and physicians are to abide.

16. The relationship between Harnage and Pugh created a hostile work environment and affected the terms and conditions of not only Sandy's employment, but that of multiple co-workers.

17. Various employees grew increasingly irritated, feeling they were doing Pugh's (or Harnage's) work while the two were busy interacting with each other during work time.

18. Sandy confronted Harnage with this knowledge, and advised him that people wanted to turn them in. Sandy was advised by Harnage not to worry, and that since Pugh did not report to him directly, it was OK.

19. Due to the Catholic nature of Franciscan, and the understanding that the administration and ethical overseers, including Father Place, frowned upon <u>not</u> reporting inappropriate activity, this was especially uncomfortable and put employees, including Sandy, in a precarious position.

20. In late 2021, Harnage hired Zimmerman, who was a close friend or acquaintance of Pugh.

21. In January 2022, Sandy was performing physician office audits, and discovered that many physicians were prescribing contraceptives.

22. Again, Sandy felt this was in violation or contravention of the ethics rules and policies of Franciscan (and its related facilities and its subsidiaries) and the Ethical and Religious Directives for Catholic Healthcare Services, by which Franciscan and its employees and physicians are to abide.

23. As a devout Catholic, this was also against Sandy's religious beliefs.

24. She discussed the issue of contraceptives being prescribed, and her religious and ethical views and religious stance against contraceptives, with Harnage on or about January 14,

2022. Sandy was told that a separate LLC was set up and as long as the providers were part of the LLC, they were allowed to prescribe contraceptives, but Sandy was not allowed to talk about the contraceptives nor document her findings.

25. Approximately, two weeks later, on or about February 2, 2022, Harnage held a TEAMS meeting with Sandy to discuss her review. While Sandy was on her computer, Harnage was driving in his truck.

26. Once the review took place, Harnage said goodbye, but did not hang up. Immediately, Pugh could be heard talking to Harnage, which meant Pugh was in the vehicle and listened to Sandy's entire review.

27. In addition to Pugh being present and listening during the review, Harnage and Pugh continued to discuss how Sandy would never be promoted.

28. Harnage and Pugh also discussed how HR did not know what they were doing and messed up job descriptions, referred to the Sisters of the organization as gay, and discussed their personal lives.

29. Soon after, Sandy spoke to an individual in HR (Cheryl Champoux) and reported the conversation between Pugh and Harnage.

30. Per her request, Sandy sent Champoux an email, and was told HR would look into it, and that no retaliation would come Sandy's way.

31. Several weeks after the review, Sandy had a mediation that Harnage was supposed to join, but he did not show up. Accordingly, Sandy could not resolve the matter.

32. On February 23, 2022, Sandy met with Champoux and Jessica Smosna regarding the conversation between Pugh and Harnage, and also provided calendars.

33. Additionally, on February 25, 2022, Sandy wrote a letter to Father Place, who was in charge of ethics, regarding the affair and contraceptive issues, asking him for help.

34. On or about March 17, 2022, Sandy had a meeting with Zimmerman, reporting and discussing the contraceptives and LLC issues, as well as the affair, which was creating a hostile work environment.

35. Days after the conversation with Zimmerman, on March 21, 2022, Sandy learned that Nicole Pugh, Harnage's paramour—was now suddenly on the ethics committee.

36. Based on the progression of foregoing circumstances, Sandy started becoming so sick to her stomach at work that she began throwing up.

37. By May 2, 2022, Sandy informed Zimmerman that she would be taking a leave of absence (FMLA) in the near future.

38. May 4, 2022, Sandy went to the doctor, and was prescribed anti-anxiety and depression medication.

39. On May 5, 2022, Sandy spoke to Cynthia Carslon of HR at length, regarding the foregoing allegations regarding the affair, and the hostile work environment it was causing.

40. Another employee also spoke to Carlson regarding the romantic relationship between Pugh and Harnage.

41. As of a month later, no update regarding the investigation was provided.

42. The other employee was so distressed from the hostile work environment, she resigned.

43. Sandy was repeatedly harassed or penalized and nitpicked and retaliated against for reporting discrimination and/or a hostile work environment.

44. Sandy was responsible for the incident reporting system and was on a team to improve and develop it. Harnage took her off of it and gave it to her counterpart, Heather O'Neill. Heather did not know the system and did not want that designation.

45. In July 2022, several employees, including Sandy, met with Caitlyn Murphy of HR, and reported Sandy being bullied and harassed by Harnage and Zimmerman, and was being treated differently than others.

46. On or about September 15, 2022, Harnage informed employees that he was terminated.

47. On October 5, 2022, Zimmerman asked to meet with Sandy. During that meeting, Sandy was written up for allegedly not following commands.

48. The very next day, on October 6, 2022, Sandy sent an email to various individuals in HR. Sandy informed them that she experienced retaliation from Harnage, in that he would take away her responsibilities and would ignore her questions. Sandy indicated that she was told there would be no retaliation for reporting Harnage and Pugh, and asked why she was being targeted and harassed.

49. On November 8, 2022, Zimmerman and Sandy were exchanging emails and talking, which caused Sandy to become so distressed that she passed out and was taken by ambulance.

50. Zimmerman did not respond, but followed up indicating to Sandy that she would be having another meeting with Sandy regarding performance.

51. On November 9, 2022, Sandy filed a formal incident report under employee harassment.

52. On that same date, Sandy asked Champoux that she be moved/transferred from under Zimmerman for her own mental health.

53. On November 10. 2022, Sandy ended up in urgent care with a panic attack.

54. Sandy was out from sometime in November 2022 through February 3, 2023, at which time she returned from FMLA.

55. 3 days after Sandy's return from FMLA, Zimmerman issued a write up/ discipline to Sandy regarding incident reports that were allegedly not addressed or closed during her FMLA leave.

56. However, it was Zimmerman and another employee who were supposed to be taking care of the reports during Sandy's leave. Yet, many were not addressed or closed.

57. On February 23, 2023, Zimmerman held a TEAMS meeting with Sandy, and gave a horrible depiction of her.

58. On that same date, Sandy filed a compliance complaint with Pat Downes, general counsel and head of ethics.

59. Sandy was then not invited to meetings to discuss risk issues, while other team members were.

60. Sandy learned that she was being targeted and retaliated against by Zimmerman, since Zimmerman and Pugh were good friends, and since Sandy had reported the affair.

61. Sandy also learned that Harnage and Zimmerman had requested that she be terminated several weeks after Zimmerman was hired.

62. In March 2023, Sandy met with Franciscan legal counsel to discuss her allegations of harassment and retaliation for reporting the prescribing of contraceptives and reporting the affair. Champoux also sent an email regarding the same.

63. On April 4, 2023, Sandy was again written up by Zimmerman.

64. On June 23, 2023, Sandy sent a letter to HR, as well as Sister Lethia Marie, questioning their lack of help with the harassment and retaliation and her request for transfer.

65. On June 30, 2023, Sandy wrote and mailed a second letter to Father Place, begging for help with the retaliation and harassment.

66. August 9, 2023, Sandy sent another email to HR, as well as Sister Lethia Marie, outlining the reasons she felt she was being harassed by Zimmerman.

67. On August 10 and 11, 2023, Sandy entered numerous complaints asking HR to follow up on her concerns regarding harassment by Zimmerman, and HR employees' failure to help.

68. On August 17, 2023, Sandy entered another complaint asking HR to follow up on Zimmerman allowing another employee to change Sandy's SPI reporting data.

69. August 23, 2023, Sandy sent an email, with attachments, indicating that there were various questions by others on handling the RL6 incident reports that Sandy was accused of mishandling.

70. Fellow employee, Jodie Carter (in her 30's/religion unknown), also reached out regarding the same or similar matters for clarification.

71. Both Carter and Sandy were confused on the same process.

72. Sandy was disciplined for allegedly doing the process incorrectly, but Carter was not.

73. On August 24, 2023, Sandy was terminated for allegedly not following through on incident reports and insubordination, both of which were false. Carter was not terminated.

74. Additionally, after Sandy's termination, Pugh was promoted to Administrative Director of Risk Management and Compliance.

## COUNT I – Family Medical Leave Act Interference-<br>Franciscan, FPN. SPI and Zimmerman

75. Paragraph 75 hereby re-alleges and incorporates Paragraphs 1 through 74 as if fully set out herein.

76. Defendants were and are covered employees under the FMLA, 29 U.S.C. Sect. 2611(4)(A).

77. At all times herein relevant, Sandy Sandy was an eligible employee with aserious health condition, pursuant to the FMLA.

78. The FMLA prohibits employers from "interfering with, restraining, or denying" an employee's exercise of FMLA rights. See 29 U.S.C. 2615.

79. At all times herein, FRANCISCAN and/or FPN and/or SPI had more than 50 employees, and thus is subject to the mandates of the FMLA.

80. Sandy was eligible for FMLA leave at all relevant times in that she had worked more than 1250 hours in the preceding twelve (12) months prior to application for leave.

81. Sandy was qualified for FMLA leave in that she had a serious health condition, per the FMLA.

82. Zimmerman's actions in writing up Sandy the day after her return from FMLA interfered with her FMLA rights.

83. Zimmerman's actions in penalizing Sandy for work not performed during the time she was on FMLA leave, constitutes interference with her FMLA rights in that she was not and should not have been required to work during FMLA leave.

84. Defendants' actions restrained Sandy's exercise of FMLA rights or would dissuade a typical employee from exercising FMLA rights..

85. Zimmerman is individually liable pursuant to definitions under the FMLA, due to her control over terms and conditions of Sandy's employment. Zimmerman had the ability and duty to ascertain the rules, regulations, and requirements of the FMLA, but failed in doing so and/or properly applying the same.

86. Further, Franciscan and/or FPN and/or SPI is vicariously liable for the actions and inactions of Megan Zimmerman ("Zimmerman"), via respondeat superior, as she was acting within the scope of his/her employment with at the time of his/her actions and/or inactions.

87. Defendants' actions were not in good faith.

88. As a direct and proximate result of these Defendants' conduct, Sandy has suffered damages, including lost pay and benefits, distress, and costs and attorneys fees.

**WHEREFORE,** Plaintiff seeks judgment against the Defendants in an amount that is fair and reasonable in the premises, plus costs of this action, liquidated damages per statute, attorneys' fees, and all other just and proper relief.

### COUNT II – Retaliation for exercising rights under the Family Medical Leave Act – Franciscan and/or FPN and/or and Zimmerman

89. Paragraph 89 hereby re-alleges and incorporates Paragraphs 1 through 88 as if fully set out herein.

90. The actions and inactions of Defendants were in retaliation for Sandy exercising her FMLA rights.

**WHEREFORE,** Plaintiff hereby requests judgment against Defendants in an amount that is fair and reasonable in the premises, for all punitive or liquidated damages available by statute or

otherwise, for all costs, interest and attorneys' fees related to this matter, and for all other just and proper relief in the premises.

### COUNT III – Intentional Infliction of Emotional Distress—

91. Paragraph 91 hereby re-alleges and incorporates Paragraphs 1 through 90 as if fully set out herein.

92. Defendants knew of, or should have known that Sandy was peculiarly susceptible to emotional distress, since she had previously fainted at work and had been transported by ambulance due to stress, she had been having panic attacks, and she had expressed the desire to be transferred due to the immense stress.

93. Thus, Defendants' actions were intentional or recklessly negligent.

94. Defendants' extreme and outrageous behavior caused Sandy to suffer severe emotional distress.

**WHEREFORE,** Plaintiff hereby requests judgment against Defendants in an amount that is fair and reasonable in the premises, for all punitive or liquidated damages available by statute or otherwise, for all costs, interest and attorneys' fees related to this matter, and for all other just and proper relief in the premises.

### COUNT IV – Title VII Religious Discrimination-All Defendants

95. Paragraph 92 hereby re-alleges and incorporates Paragraphs 1 through 91 as if fully set out herein.

96. Defendants' actions in requiring or attempting to require Sandy to not report, or to "work around" the admonition against prescribing contraceptives constitutes discrimination against Sandy based on her religious beliefs.

97. Defendants' actions of disciplining and terminating Sandy after reporting the affair and voicing her opinions about contraceptives being prescribed against her religious beliefs, constitute religious discrimination.

**WHEREFORE,** Plaintiff hereby requests judgment against Defendants in an amount that is fair and reasonable in the premises, for all punitive or liquidated damages available by statute or otherwise, for all costs, interest and attorneys' fees related to this matter, and for all other just and proper relief in the premises.

### COUNT V – Retaliation for reporting activities against religious beliefs and for complaining about discrimination based on religion—Title VII-All Defendants

98. Paragraph 98 hereby re-alleges and incorporates Paragraphs 1 through 97 as if fully set out herein.

99. Defendants' actions in disciplining Sandy, writing her up, and ultimately terminating her constitutes retaliation against Sandy for voicing her religious beliefs against extra marital affairs, and against prescribing contraceptives.

**WHEREFORE,** Plaintiff hereby requests judgment against Defendants in an amount that is fair and reasonable in the premises, for all punitive or liquidated damages available by statute or otherwise, for all costs, interest and attorneys' fees related to this matter, and for all other just and proper relief in the premises.

### COUNT VI- ILLINOIS WHISTLEBLOWER ACT- 740 ILCS 174/20 and 20.1

100. Paragraph 100 hereby re-alleges and incorporates Paragraphs 1 through 99 as if fully set out herein.

101. Sandy refused to alter records or to leave out information regarding prescribing contraceptives, since reporting these actions is required pursuant to the Catholic ethical rules for hospitals and pursuant to Franciscan/FPN/SPI policies. In other words, Sandy was being asked to

violate company policy and (worldwide) Catholic ethical rules promulgated by the United States Conference of Catholic Bishops, in addition to going against her own religious beliefs. She refused. As a result, she was harassed, and terminated.

102. Additionally, Sandy reported the affair between Pugh and Harnage, which was also a violation of the Catholic ethical rules for hospitals. In return, Defendants retaliated against her and fired her.

103. Accordingly, Defendants violated the Illinois Whistleblower Act.

**WHEREFORE,** Plaintiff hereby requests judgment against Defendants in an amount that is fair and reasonable in the premises, including but not limited to back pay, for all punitive or liquidated damages available by statute or otherwise, for all costs, interest and attorneys' fees related to this matter, and for all other just and proper relief in the premises.

.

## COUNT VII -ADEA-AGE DISCRIMINATION

104. Paragraph 104 hereby re-alleges and incorporates Paragraphs 1 through 103 as if fully set out herein.

105. Defendants' actions in disciplining Sandy, writing her up, and ultimately terminating her, while not disciplining a much younger employee who allegedly had the same concerns and confusion regarding the reports at issue, constitute age discrimination in violation of the ADEA.

**WHEREFORE,** Plaintiff hereby requests judgment against Defendants in an amount that is fair and reasonable in the premises, including but not limited to back pay, for all punitive or liquidated damages available by statute or otherwise, for all costs, interest and attorneys' fees related to this matter, and for all other just and proper relief in the premises.

### COUNT VIII – SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

106.   Paragraph 106 hereby re-alleges and incorporates Paragraphs 1 through 105 as if fully set out herein.

107.   The relationship between Pugh and Harnage, the effects it had on Sandy and the workplace, and the harassment, discipline, retaliation and termination that followed the reporting and complaining about such relationship by Sandy and other employees, was severe and pervasive enough to create a hostile work environment.

**WHEREFORE**, Plaintiff hereby requests judgment against Defendants in amount to fully compensate him, for all punitive or liquidated damages available by statute or otherwise, for all costs, interest and attorney's fees related to this matter, and for all other just and proper relief in the premises.

### COUNT IX -RETALIATION FOR REPORTING SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT

108.   Paragraph 108 hereby re-alleges and incorporates Paragraphs 1 through 107 as if fully set out herein.

109.   After Sandy reported that she felt she was being subjected to a hostile work environment based on reporting the affair, and the harassment and intimidation escalated with discipline, having Pugh assigned to the ethics committee, and eventually termination.

110.   The foregoing constitutes retaliation for reporting the hostile work environment.

**WHEREFORE**, Plaintiff hereby requests judgment against Defendants in amount to fully compensate her, for all punitive or liquidated damages available by statute or otherwise, for all costs, interest and attorney's fees related to this matter, and for all other just and proper relief in the premises.

## COUNT X RETALIATION FOR REPORTING ETHICS VIOLATIONS AND REFUSING TO FRAUDULENTLY COMPLETE DOCUMENTS IN VIOLATION OF PUBLIC POLICY

111. Paragraph 111 hereby re-alleges and incorporates Paragraphs 1 through 110 as if fully set out herein.

112. After Sandy reported ethics violations, reported violations of the Catholic policies, and refused to do what she believed to be fraudulent and illegal (completing documents which covered up the prescriptions of contraceptives), Sandy was harassed, disciplined, and terminated, in violation of public policy.

**WHEREFORE**, Plaintiff hereby requests judgment against Defendants in amount to fully compensate him, for all punitive or liquidated damages available by statute or otherwise, for all costs, interest and attorney's fees related to this matter, and for all other just and proper relief in the premises.

Respectfully submitted,
/s/ Robin G. Remley
Robin G. Remley
robin@remley-law.com
Attorney for Plaintiff Sandy Sepulveda
Law Office of Robin Remley LLC
123 N. Main St
Suite 204-C
Crown Point, IN 46307
(219) 756-9600

/s/ Paul Luka
Paul Luka
paul@mndozalaw.net
Mendoza Law, P.C.
120 S. State Street – Suite 400
Chicago, IL 60603
(312)971-7309

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

Respectfully submitted,

/s/ Robin G. Remley
Robin G. Remley
robin@remley-law.com
Attorney for Plaintiff, Sandy Sepulveda
Law Office of Robin Remley LLC
(219) 756-9600

/s/ Paul Luka
Paul Luka
paul@mndozalaw.net
Mendoza Law, P.C.
120 S. State Street – Suite 400
Chicago, IL 60603
(312)971-7309

## CERTIFICATE OF SERVICE

I certify that on July 25, 2024 service of a true complete copy of the foregoing pleading or paper was made upon each party or attorney of record via United States e-filing system.

s/ Robin G. Remley